## 2828.  FANT *v.* THE STATE.

1. When considered in connection with the general charge, the exceptions to the charge of the court are without merit. The request to charge, so far as pertinent to the evidence, was covered by proper instructions.
2. It is not error for a judge, after having properly instructed a jury as to the form of their verdict and after having asked them if they wished to retire in order to correct an irregular, incomplete, or uncertain verdict, to permit the corrections to be made in open court, where the jury have informed the court as to the true meaning of their finding and the verdict they intended to return.

DECIDED NOVEMBER 29, 1910.

Indictment for murder; from Franklin superior court—Judge Meadow. June 14, 1910.

*W. R. Little, A. G. & Julian McCurry,* for plaintiff in error.

*Clifford Walker,* solicitor-general, *George L. Goode,* contra.

RUSSELL, J.  The defendant was indicted for murder and convicted of voluntary manslaughter. It seems, from the evidence, that Rafe Jenkins went to the house of the defendant, Judge Fant. The evidence does not disclose the original purpose of his visit. Judge Fant and a party of his employees or colaborers were engaged in knocking down cotton stalks, preparatory for plowing. According to some of the testimony, Rafe Jenkins was under the influence of intoxicants, and, whether he was or not, it appears that there were some trifling disagreements between him and the defendant before the parties left the house. According to the testimony for the State, Rafe Jenkins made inquiry, after all parties had gone into the yard, as to Judge Fant's reason for carrying a large stick. Sis Laboon, who was said to be Judge's wife, told him that Judge Fant was going to hit him with the stick. Thereupon the deceased said, "I will see if he will hit me." He walked up to Judge, and Judge hit him with the stick, knocking him down and senseless. There had been no difficulty and no words between the parties at that time, and the deceased had nothing in his hands. A few days later Jenkins died as a result of the wound. According to the defendant's statement, he had eaten his dinner and was reading a paper, when the deceased came to his house and was invited in. The deceased sat down and shortly afterwards tried to get the paper away from him. The defendant told him that he (the deceased) was not in condition to read the paper, because he was half drunk. The deceased cursed the defendant,

reached and got the paper out of his hand, and threw it down. The defendant said nothing, because he was scared, but went out and decided he would go to his field. He started to turn round, and the deceased shook him, and said if he wasn't such a big man, he would tear him in two. As the defendant went out of the house—according to his statement—he said to the crowd, "Let's go to the field," and picked up the stick with which he had been knocking down cotton stalks and went on out. The deceased asked the defendant what he was going to do with the stick, and insisted that the defendant had gotten it to hit him with. The deceased put his hands in his pocket and started towards the defendant, who told him to stand back; and when he got in reach of the deceased, the defendant hit him a back-handed lick. According to his statement, he did not want to hurt him, but he hit him simply because he was afraid of him. In addition to the testimony as to the direct fact of the striking, there was evidence on the part of the State that the defendant at first claimed that the deceased received the injuries upon his head by falling off the porch of the defendant's house.

It is insisted that the evidence did not authorize a verdict, because the defendant at most could not be guilty of more than involuntary manslaughter; that it is not shown that there was any intention on the part of defendant to kill the deceased, but on the contrary, the evidence showed that there was no such intention. Personally we might take this view of the case, and yet we can not say that facts and circumstances in evidence did not authorize the conclusion on the part of the jury that the use of the weapon which was employed, and which was before the jury, the force with which the weapon was used, and the fatal result of the blow, as well as other facts and circumstances appearing in the testimony, were not sufficient to authorize the jury to find either that the defendant, acting on the impulse of passion, intended to kill, or at least that he reasonably could have expected that the blow as inflicted would prove mortal. The law applicable to involuntary manslaughter was submitted by the court to the jury, and it can not be assumed that the jury failed to consider that phase of the case.

The first special ground of the motion for a new trial complains that the court erred in charging the jury as follows: "I charge

you, if you believe, from the facts and circumstances proven in this case, that they were sufficient to arouse the fears of a reasonable man, the fears of these offenses to which your attention has just been called, and that the defendant acted under those fears and not in a spirit of revenge, that a seeming necessity would be the same, in so far as his justification is concerned, as a real necessity; and if he acted under those fears and there was no necessity, but if they were sufficient, as already stated to you, to arouse the fears of a reasonable man that these offenses were about to be committed upon him, then he would be justified whether there was a real necessity or not. An apparent necessity would be the same as a real necessity." The plaintiff in error insists that this instruction was error, because it was confusing, and that it was error not to inform the jury as to the kind of offenses to which fears of a reasonable man would apply, to justify the defendant, and that it was error to qualify the instruction with the words "and there was no necessity." The instruction complained of might have been injurious to the defendant, but for the fact that the judge had already instructed the jury what was meant by the words "these offenses," and he again called their attention to his charge upon that subject. The jury could not have failed to understand that these words referred to the commission of a felony or other serious bodily injury. So far as the use of the words "and there was no necessity" is concerned, it is apparent that the charge of the court upon this subject was as favorable as the defendant could ask. The principle was very tersely stated to the jury, when the judge told them that if the defendant's act was influenced by the fears of a reasonable man, he would be justified, whether there was any real necessity or not.

It is insisted in the motion for a new trial that the verdict is contrary to the following charge of the court, given at the request of defendant: "If you believe, from the testimony, that the defendant was at his own home and in his own yard, and was himself free from fault, and the deceased was manifestly intending to commit a trespass on the defendant, the defendant was under no obligation to retreat, but had a right to stand his ground and use such force as was reasonably necessary to prevent such trespass." It is not pointed out why the verdict of the jury is

contrary to this charge; so this ground of the motion presents nothing for consideration. It can well be assumed, however, that the verdict is not contrary to the charge, but that the jury did not consider that there was any evidence either that the defendant was free from fault or that the deceased was manifestly intending to commit a trespass on him. As an abstract proposition of law, the statement seems to be correct, but it can not be said that there was no evidence which would have authorized the jury to find that the deceased was not intending to commit any trespass on the defendant at the time that he was stricken.

The court charged the jury: "You are sole judges of the weight to be given the evidence, and, in undertaking to find out that, the law authorizes you to bring to your aid your own knowledge derived from your every-day experience of human affairs; you may bring that knowledge to bear on all the facts and circumstances of the case; you may bring it to bear when you undertake to determine whether or not this defendant acted under the fears of a reasonable man." It is alleged that the court erred in adding to this as follows: "You want to determine whether or not he felt it was necessary to kill in order to prevent any of the injuries being inflicted upon him which the law provides a fear may justify or may authorize him to do." It is insisted that all that is necessary, under the law, to justify a killing is the fear of a reasonable man that a felony is about to be committed on him by the deceased, and that the law does not impose upon him the burden of feeling that it is necessary to kill. A killing may be justified by showing that it was actually necessary, or that the circumstances were such that the slayer actually believed that it was necessary to kill; but we know of no law which will justify a killing in self-defense upon any other ground. If there is an actual necessity, the slayer is justified. If, in good faith, he believes there is an actual necessity for his own preservation, he may kill and be justified, even though there be no real necessity. And though one may kill to prevent the commission of a felony or other serious bodily injury upon his person, he must at least believe that it was necessary to kill in order to save his life or to prevent the felony. So we see no error in the instruction.

After the jury had announced through a bailiff that they had agreed upon a verdict, they were brought into court, and the

solicitor-general read the following verdict: "We, the jury, find the defendant guilty of manslaughter." The court thereupon called the attention of the jury to his previous instructions, and said that they should state in their verdict whether they found the defendant guilty of voluntary or involuntary manslaughter. One of the jurors, acting as spokesman, said, "It is voluntary." Thereupon the judge said to the jury, "You can retire to your room, and let it speak whatever you want; if you want it voluntary, put the 'voluntary' ahead of the word 'manslaughter.' " A number of jurors said "voluntary manslaughter" was the verdict. The court then said, "Is that what you all say, gentlemen?" The jury replied in the affirmative. Thereupon the court permitted the jury, without leaving their box, to write the word "voluntary" before the word "manslaughter." The bill of indictment was again returned to the solicitor-general, who read the verdict: "We, the jury, find the defendant guilty of voluntary manslaughter. E. B. Purcell, foreman." The jury was thereupon polled, and each juror answered it was his verdict. We find no error whatever in the action of the court in the premises. It is not error for a judge, after having properly instructed the jury as to the form of their verdict and after having asked them if they wished to retire in order to correct an irregular, incomplete, or uncertain verdict, to permit the corrections to be made in open court, where the jury have informed the court as to the true meaning of their finding and the verdict they intended to return.

*Judgment affirmed.*